

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

___ FILED       ___ LODGED
___ RECEIVED   ___ COPY

FEB 0 3 2000

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

CAREFREE TRADING, INC., d/b/a       )
CFT, INC.,                           )
                                     )
        Plaintiff                    )
                                     )
        v.                           )    CIVIL ACTION
                                     )    NO. 98-1581 PHX RGS
LIFE CORPORATION,                    )
                                     )
        Defendant.                   )
                                     )

MEMORANDUM AND ORDER

YOUNG, D.J.[1]                                    January 28, 2000

I.    Introduction

        This case presents an intellectual property dispute between

two manufacturers of surgical masks used in emergency resusci-

tation.  It grew out of a trademark proceeding originally

instituted by Life Corp. ("Life") against Carefree Trading, Inc.

("Carefree"), challenging Carefree's use of the trademark LIFE

MASK.  The Trademark Trial and Appeal Board (the "Board") agreed

with Life and ordered that Carefree's mark be canceled.  See Life

Corp. v. Carefree Trading Corp., 47 U.S.P.Q.2d 1151, 1154 (TTAB

1998).

_____

        [1] Of the District of Massachusetts, sitting by designation.

Carefree then filed this federal district court action appealing the Board's decision.[2]  Carefree also brings a claim alleging that Life is infringing one of Carefree's patents.  Life counterclaims for trademark infringement and unfair competition by Carefree, seeking declaratory, injunctive, and compensatory relief.  Life here moves for summary judgment in its favor on all claims.

II.  Factual Background

Life has been using LIFE as its house mark and trade name since 1986.  LIFE is used alone and in combination with descriptive words and model numbers.  See Kirchgeorg Decl. Exs. 1-3, 7-11, 13A, 14, 17-28, 38-41, 51; Life Corp., 47 U.S.P.Q.2d at 1152, 1153.  LIFE is registered in combination with descriptive terms like CORPORATION and O2.  See Kirchgeorg Decl. Exs. 9-11.

Carefree uses and had registered LIFE MASK for its resuscitation masks.  See Gibson Decl. Ex. 24.  Both parties sell resuscitation-inhalation masks.  Life sells an entire oxygen unit which includes such masks.  See id. Ex. 25.  It also sells the masks separately.  See id.  A number of other companies in the business of making medical devices either competitive with, or

---

[2] See 15 U.S.C. § 1071 (allowing appeal from decisions of the Trademark Trial and Appeal Board to either the Federal Circuit or a federal district court).

closely related to, Life's products use the mark LIFE in combination with other words, such as LIFECARE, LIFEKIT, LIFELINE, LIFESAVER, LIFE SUPPORT, AND LIF-O-GEN. See id. Ex. 26.

For the purposes of this motion, Life is willing to assume that there is no evidence of actual confusion, that Carefree selected LIFE in good faith, that the purchasers are largely sophisticated about emergency resuscitation equipment, and that the evidence of third party LIFE marks and names is admissible. See Life Mem. at 2.

III. Discussion

    A.   Carefree's Appeal and Its Trademark Infringement Claim Against Life

        1.   Standard of Review

Until quite recently, the standard of review from Patent and Trademark Office decisions was thought to be an issue settled long ago by the Supreme Court in Morgan v. Daniels, 153 U.S. 120, 125 (1894) ("[P]atent [O]ffice [decisions] must be accepted as controlling upon . . . question[s] of fact . . . unless the contrary is established by testimony which . . . carries thorough conviction."). This standard has been in force in the Ninth Circuit throughout most of this century: "Upon principle and authority, therefore, it must be laid down as a rule that where

3

the question decided in the Patent Office is one between
contesting parties as to priority of invention, the decision
there made must be accepted as controlling upon that question of
fact in any subsequent suit between the same parties, unless the
contrary is established by testimony which in character and
amount carries thorough conviction." Safeway Stores, Inc. v.
Dunnell, 172 F.2d 649, 652 (9th Cir.) (quoting Morgan, 153 U.S.
at 125), cert. denied, 337 U.S. 907 (1949). The Ninth Circuit
also extended this rule to trademark infringement decisions by
the Board: "We have also ruled that the civil action permitted
by 15 U.S.C. § 1071 is to be a trial de novo, but that the
decision of the Board must be accepted as controlling on fact
issues unless overcome under the ["thorough conviction"]
standard." Wells Fargo & Co v. Stagecoach Properties, Inc., 685
F.2d 302, 306 (9th Cir. 1982) (citing Redken Laboratories, Inc.
v. Clairol, Inc., 501 F.2d 1403, 1404 [9th Cir. 1974]). In other
words, "[t]he trial is de novo [only] to the extent that the
parties are permitted to introduce additional evidence relevant
to the issues raised before the Board." Id.

The Supreme Court dismantled this standard of review in
Dickinson v. Zurko, 119 S. Ct. 1816 (1999),[3] a case involving the

---

[3] Neither party appears to appreciate the significance of
Dickinson as neither has cited it nor mentioned it at oral
argument on November 18, 1999. In part, this lacunae is an

4

Federal Circuit's application of a "clearly erroneous" standard
of review to factual findings made by the Patent and Trademark
Office (the "Patent Office"). These respondents had argued that
the "substantial evidence" standard of the Administrative
Procedure Act, 5 U.S.C. § 706(2)(E) (1994), (the "Act") should
apply instead, but the Federal Circuit concluded that <u>Morgan</u> v.
<u>Daniels</u>, with its 1894 date of issuance, established a rather
impressive historical pedigree for the practice of granting wide
deference to the factfinding function of the Patent Office. <u>See</u>
<u>In re Zurko</u>, 142 F.3d 1447, 1449 (Fed. Cir. 1998), <u>rev'd</u>, 119 S.
Ct. 1816 (1999). The Federal Circuit held that section 559 of
the Administrative Procedure Act -- which states that the Act
does "not limit or repeal additional requirements . . .
recognized by law" -- recognized an exception for the type of
pre-existing narrow review compelled by <u>Morgan</u> v. <u>Daniels</u>. <u>See</u>
<u>id.</u> at 1457.

---

inevitable consequence of the burden under which the bar of the
District of Arizona has labored for so long due to a lack of
adequate judicial resources. <u>But see</u> 2000 Judiciary Appro-
priations Act, Pub. L. No. 106-113, 113 Stat. 1501 (1999)
(authorizing three additional district court judgeships for the
District of Arizona). This issue had been fully briefed well
before the Supreme Court decided <u>Dickinson</u> on June 10, 1999.
After this case was transferred to this session on August 25,
1999 and set for hearing, the parties apparently overlooked the
necessity of updating their analysis.

The Supreme Court rejected this view of <u>Morgan</u> v. <u>Daniels</u>:

> We concede that the Court . . . used language that
> could be read as setting forth a [strict] court/court
> standard of review. . . . But the Court did not use
> the emphasized words today; it used those words more
> than 100 years ago.  And its reasoning makes clear that
> it meant those words to stand for a court/agency review
> standard, a standard weaker than the standard used by
> "an appellate court in reviewing findings of fact made
> by the trial court."

<u>Dickinson</u>, 119 S. Ct. at 1821-22 (citing <u>Morgan</u>, 153 U.S. at

123).  The Court adopted this interpretation of its precedent

despite the fact that it was "undisputed that, until today's

decision, both the patent bench and the patent bar had concluded

that the stricter 'clearly erroneous' standard was indeed . . . a

requirement placed upon the [reviewing district court]."  <u>Id.</u> at

1826 (Rehnquist, C.J., dissenting).

     Without <u>Morgan</u> v. <u>Daniels</u> as the prop for an historical

exception to the Act's requirements, the Supreme Court held that

judicial review of decisions from the Patent Office must follow

the ordinary procedures established by the Act.  <u>See id.</u> at 1824.

Thus, this Court, in reviewing the Board's decision to cancel

Carefree's mark, must examine whether the Board's decision is

"unsupported by substantial evidence" or involves an "arbitrary

[or] capricious" application of law.  5 U.S.C. § 706(2); <u>Mester</u>

<u>Mfg. Co.</u> v. <u>Immigration & Naturalization Service</u>, 879 F.2d 561,

565 (9th Cir. 1989).  In making this determination, "[substantial

evidence] 'means such relevant evidence, as a reasonable mind
might accept as adequate to support a conclusion.'" <u>Maka</u> v.
<u>Immigration & Naturalization Service</u>, 904 F.2d 1351, 1355 (9th
Cir. 1990) (quoting <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401
[1971]). "Put differently, [the Court] must decide whether on
this record it would have been possible for a reasonable jury to
reach the Board's conclusion." <u>Allentown Mack Sales & Serv.,
Inc.</u> v. <u>National Labor Relations Bd.</u>, 522 U.S. 359, 367 (1998).
"This standard is less deferential than the 'clearly erroneous'
standard," <u>Noriega-Perez</u> v. <u>United States</u>, 179 F.3d 1166, 1176
(9th Cir. 1999), and, by implication, the "thorough conviction"
standard that prevailed in the Ninth Circuit prior to the Supreme
Court's decision in <u>Dickinson</u> v. <u>Zurko</u>.

    2.  <u>The Board's Finding</u>

The Board first determined that Life had priority because it
had been using the mark LIFE since at least 1986 while Carefree
had only been using the mark LIFE MASK since 1989. <u>See Life
Corp.</u>, 47 U.S.P.Q.2d at 1153. The Board then examined several
pertinent factors in order to determine whether there was a
likelihood of confusion between the marks. The Board found that
there was a likelihood of confusion based upon the following
factors: (1) "[Life's] emergency oxygen units and replacement
parts and [Carefree's] masks are closely related and identical in

the case of masks"; (2) "compar[ing] the parties' trade name and marks in their entireties, giving appropriate weight to the word LIFE in each, we find that they are substantially similar in sound, appearance and commercial impression,"; (3) "none of the marks in the third-party registrations consists of the word LIFE combined with a descriptive or generic term [like MASK]"; and (4) although the parties market to sophisticated consumers, "even sophisticated purchasers are not immune to source confusion, especially in cases like the present one where identical and closely related goods are marketed under substantially similar marks and trade name."  Id. at 1153-54.

### 3.  Analysis

Carefree argues that the Court should refuse to affirm the Board's ruling, arguing that the Board made manifest errors of law and fact in its decision.  Specifically, Carefree argues that the Board's conclusion cannot stand under the controlling standard for determining whether a likelihood of confusion exists.  See AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979) (listing eight factors for likelihood of confusion analysis).  Examination of the relevant eight factors, however, reveals that the Board's decision is supported by "substantial evidence" in the record, 5 U.S.C. § 706(2)(E), such

that "it would have been possible for a reasonable jury to reach the Board's conclusion." <u>Allentown Mack</u>, 522 U.S. at 367.

    (a) <u>Strength of the Mark</u>

  Life concedes that its mark is "highly suggestive" and "inherently weak." Life Mem. at 5. As such, Life recognizes that LIFE is "a weak mark entitled to a restricted range of protection." <u>AMF</u>, 599 F.2d at 350. Thus, "only if the marks are quite similar, and the goods closely related, will infringement be found." <u>Id.</u> (citation omitted). The Board held that Life met this more restrictive test for weak marks: "[E]ven weak marks are entitled to protection where confusion is likely, and here, [Carefree's] mark LIFE MASK is substantially similar in sound, appearance and commercial impression to [Life's] trade name and trademarks consisting of LIFE." <u>Life</u>, 47 U.S.P.Q.2d at 1154. The Board held that the term MASK was merely generic and there-fore did little to distinguish Carefree's product. <u>See id.</u> The Board acknowledged Carefree's evidence of third-party use but held the evidence insignificant given that none of the marks were "as similar to [Life's] trade name and marks as is [Carefree's] mark LIFE MASK." <u>Id.</u> Specifically, none of the third party marks "consist[ed] of the word LIFE combined with a descriptive or generic term." <u>Id.</u>

(b)  <u>Proximity of the Goods</u>

Carefree argues that the goods are not sufficiently proximate to weigh in favor of a likelihood of confusion.  It argues that LIFE is primarily in the oxygen tank business and only secondarily in the mask business, selling masks as replacement parts to its oxygen units.  See Carefree Opp'n. Mem. at 17. Life's oxygen unit costs approximately $350.00 while Carefree's masks cost only a few dollars.  See id. at 18.  The Board, however, noted that Carefree offered to sell its masks for use in Life's oxygen units, raising the inference that the parties' masks are interchangeable or at least competitive.  The Board also noted that Life has sold masks separately from its oxygen units since 1986, that the parties have promoted their goods at some of the same trade shows, and that "the parties' goods move in the same channels of trade to the same classes of purchasers." Life, 47 U.S.P.Q.2d at 1153.

(c)  <u>Similarity of the Marks</u>

The Board found that, with respect to Life's marks LIFE CORPORATION and LIFE CORPORATION OXYGEN PAC, and Carefree's mark LIFE MASK, "the dominant portion in each is the word LIFE."  Id. Moreover, "[b]ecause [Life] has consistently over the years displayed the word LIFE in a large and distinctive fashion on its goods and literature, there can be no question that the

10

significant and dominant feature of [Life's] trade name and
trademarks is the word LIFE and that purchasers of [Life's] goods
as well as those exposed to [Life's] literature will be likely to
utilize this term to identify and distinguish both [Life] and its
goods."  Id.  The Board held that confusion was especially likely
with respect to Carefree's mark because "MASK is clearly generic
for [Carefree's] goods."  Id.  Thus, the Board found that the two
marks "are substantially similar in sound, appearance and com-
mercial impression."  Id.

(d)  Evidence of Actual Confusion

Life admits, for purposes of this motion, that there has
been no evidence of actual confusion.

(e)  Marketing Channels Used

As noted above, the Board found that the parties marketed
their respective masks in overlapping channels of commerce.
Carefree asserts, but does not support, that "the channels of
trade are only marginally overlapping in a broad sense . . . "
Carefree Opp'n. Mem. at 19.

(f)  Type of Goods and the Degree of Care Likely to Be
Exercised by the Purchaser

Life has assumed, for purposes of this motion, that the
purchasers are sophisticated.  The Board noted, however, that
"even sophisticated purchasers are not immune to source

11

confusion, especially in cases like the present one where
identical and closely related goods are marketed under sub-
stantially similar marks and trade name." Life, 47 U.S.P.Q.2d at
1154.

       (g)   <u>Defendant's Intent in Selecting the Mark</u>

    Life has assumed, for purposes of this motion, that Carefree
acted in good faith.

       (h)   <u>Likelihood of Expansion of the Product Line</u>

    There is no evidence in the record regarding, nor did the
Board address, the likelihood that either party intended to
expand its product line.

       (i)   <u>Conclusion</u>

    As the foregoing discussion reveals, the Board had several
well-articulated reasons for adopting its view that the marks
were likely to be confused. Carefree attempts to escape from the
force of the Board's decision by arguing that the Board was only
empowered to address the ability of Carefree to *register* a mark,
and therefore did not address its *use* of the mark, which could
possibly give rise to common law protection. <u>See</u> Carefree Opp'n.
Mem. at 21. That limitation of the Board's scope of review is
precisely why the Ninth Circuit allows de novo consideration of
additional evidence not presented or allowed to be presented to

12

the Board.  See Wells Fargo, 685 F.2d at 306.[4]  Unfortunately for Carefree, it has not offered the evidence needed to demonstrate that the Board's determination was beyond the bounds of what a reasonable jury may have concluded.  See Allentown Mack, 118 S. Ct. at 823.

Carefree argues that the Board:  (1) failed to consider the stylized manner in which Carefree displays its LIFE MASK mark in actual use; (2) ignored the fact that some third-party marks containing LIFE were in use; (3) gave undue weight to the fact that Life's product was featured in a network television program; and (4) determined that Life owned the mark LIFE without any supporting evidence.  See Carefree Opp'n. Mem. at 21-22.  These contentions are simply insufficient to establish the error of the Board's decision upon review, especially bearing in mind the Ninth Circuit's caution that the

> eight-factor test for likelihood of confusion is pliant.  Some factors are much more important than others, and the relative importance of each individual factor will be case-specific.  Although some factors -- such as the similarity of the marks and whether the two companies are direct competitors -- will always be important, it is often possible to reach a conclusion

---

[4] The Court concludes that this aspect of the Ninth Circuit's approach to Patent Office review is unaffected by the Supreme Court's decision in Dickinson v. Zurko.  See 5 U.S.C. § 706(2)(F) (contemplating "trial de novo by the reviewing court" under certain circumstances); Proietti v. Levi, 530 F.2d 836, 838 (9th Cir. 1976) (noting that de novo review of facts is appropriate when "the agency fact-finding procedures are inadequate").

13

with respect to likelihood of confusion after con-
sidering only a subset of the factors.

Brookfield Communications, Inc. v. West Coast Entertainment
Corp., 174 F.3d 1036, 1054 (9th Cir. 1999).

First, the fact that Carefree uses the mark LIFE MASK in
conjunction with a graphic design does little to change the
threat of likely confusion that the Board found.  In both the
stylized and the non-stylized format, the dominant feature of
Carefree's mark are the *words* "Life Mask."  Moreover, the
exhibits to which Carefree refers in its briefing include the
term LIFE MASK in both its "stylized" format and in the regular
block print which formed the basis of the Board's decision.  See
Stockett Decl. Exs. 8-11.

Second, the Board expressly considered the fact that other
medical device manufacturers use the term LIFE in their marks.
Nevertheless, the Board found (and was entitled to conclude) that
Carefree's mark posed a special likelihood of confusion because
it used the term LIFE in conjunction with a generic term (MASK)
and because its product was identical to a product offered by
Life.

Third, Carefree has done nothing to show that the Board
acted arbitrarily or capriciously when it credited the appearance
of Life's products on a network television program.  Carefree

14

argues that the Board should not have drawn any inferences from the television appearances because Life did not offer any consumer studies or other evidence to support the conclusion that good will was generated from the product placement. Under the standard of review in this case, however, it is Carefree that would have to demonstrate the opposite conclusion through consumer studies or other evidence. In the absence of such evidence, the Board's commonsense conclusion that a network television program, viewed by millions of people, could garner consumer good will for the manufacturers of featured products must stand.

Finally, Carefree argues that the Board was not entitled to find that Life held a protectable interest in the term LIFE. The Board's conclusion was based upon Life's consistent use of the term in its promotional materials since 1986. Carefree again argues that the Board's decision was not supported by "any survey evidence or the testimony of any consumer." Carefree Opp'n. Mem. at 22. Because it fails to offer *evidence* to counteract the Board's reasonable conclusion, Carefree fails to establish that the Board's conclusion was without support in the record.

For the foregoing reasons, the Court affirms the Board's decision and GRANTS Life's motion for summary judgment on

15

Carefree's trademark infringement claim against it (Count II of
Carefree's Complaint).

    B.    <u>Life's Trademark and Unfair Competition Claims</u>

    Life brings four separate claims against Carefree in its
Counterclaim:  trademark infringement (Count I), unfair
competition under the Lanham Act (Count II), declaratory judgment
of non-infringement and patent invalidity (Count III), and
monopolistic practices under the Sherman Act (Count IV).  Life
apparently believes that it has moved for summary judgment on
these claims, although its memoranda exclusively address the
propriety of granting summary judgment against Carefree's claims.
Having made no factual or legal arguments in support of a
purported motion for summary judgment on *its* claims, the Court
DENIES Life's request that the Court enter judgment in its favor
on the counterclaims.[5]

---

    [5] At the very least, Carefree must be given an opportunity
to offer affirmative defenses to Life's trademark infringement
counterclaim.  For instance, Carefree could argue that its LIFE
MASK mark is protected under the common law, despite the Board's
cancellation.  <u>See</u> <u>California Cooler, Inc.</u> v. <u>Loretto Winery,</u>
<u>Ltd.</u>, 774 F.2d 1451, 1454 (9th Cir. 1985) ("Thus deficiencies in
registration, such as failure to renew, <u>or even cancellation</u>, do
not affect common law trademark rights.") (emphasis added); <u>see</u>
<u>also</u> <u>Kellogg Co.</u> v. <u>National Biscuit Co.</u>, 305 U.S. 111, 117 n.3
(1938) ("[I]t is well settled that registration under [the
Trademark Act of 1920] has no effect on the domestic common-law
rights of the person whose trade-mark is registered.").

16

The Court pauses, however, to consider the procedural
posture of this case and, more particularly, the road ahead.
Life's failure to argue on behalf of its own claims reflects a
belief on its part that success on its trademark infringement
counterclaim follows inevitably now that it has prevailed on the
question of whether to affirm the Board's cancellation of Care-
free's mark. Apparently that is why it has stipulated to the
dismissal of such claim and its unfair competition counterpart.
See Docket # 126 and the order of December 30, 1999, Docket #
128. If so, Life is too carefree. Admittedly, both inquiries
focus upon the question of whether Carefree's mark creates a
likelihood of confusion with Life's mark. See Brookfield, 174
F.3d at 1053 ("The core element of trademark infringement is the
likelihood of confusion, i.e., whether the similarity of the
marks is likely to confuse customers about the source of the
products.") (citations omitted); Redken, 501 F.2d at 1404-05
(treating likelihood of confusion as grounds for cancellation).
And, indeed, if the Board's factual finding of a likelihood of
confusion were given preclusive effect in Life's affirmative
case, summary judgment in its favor might be appropriate. Cf.
Interstellar Starship Servs., Ltd. v. Epix Inc., 184 F.3d 1107,
1109-10 (9th Cir. 1999) ("Under federal trademark infringement
law, 15 U.S.C. § 1114 [1994], federal unfair competition law, 15

U.S.C. § 1125[a] [1994], and [state] common law of trademark

infringement, [a plaintiff] can defeat summary judgment by

placing evidence on the record tending to 'establish that [the

defendant] is using a mark confusingly similar to a valid,

protectable trademark of [the plaintiff's].'" [citing Brookfield,

174 F.3d at 1046]).

It is not immediately clear to this Court, however, that the

Board's determination should be given preclusive effect in Life's

affirmative case. See Flavor Corp. of Am. v. Kemin Indus., Inc.,

493 F.2d 275, 281 (8th Cir. 1974) (holding that Court of Customs

and Patent Appeals' decision could be given preclusive effect in

subsequent infringement litigation because Congress had made the

Court an Article III court in 1958). The preclusion inquiry

focuses on whether the Board's factfinding involves the type of

procedures that the Supreme Court has identified as appropriate

for res judicata or collateral estoppel effect in subsequent

related suits. See United States v. Utah Constr. & Mining Co.,

384 U.S. 394, 422 (1966) ("When an administrative agency is

acting in a judicial capacity and resolved disputed issues of

fact properly before it which the parties have had an adequate

opportunity to litigate, the courts have not hesitated to apply

res judicata to enforce repose."). Given the limited nature of

the Board's factual inquiry and its reliance on a "cold" record

18

without live witnesses, it is arguable that the Board's factual
determinations should not be binding in a subsequent suit for
damages which has always required a jury trial. See Dairy Queen,
Inc. v. Wood, 369 U.S. 469, 477 (1962) (action for damages for
trademark infringement "subject to cognizance by a court of
law"); see also Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir.
1946) (copyright action for damages is "triable at 'law' and by a
jury as of right"); Video Views, Inc. v. Studio 21, Ltd., 925
F.2d 1010, 1014 (7th Cir. 1991) ("There is little question that
the right to a jury trial exists in a copyright infringement
action when the copyright owner endeavors to prove and recover
its actual damages . . . ."), overruled on other grounds by
Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994); 3 Melville B.
Nimmer & David Nimmer, Nimmer on Copyright § 12.10[B] (1999)
("[I]t is beyond dispute that a plaintiff who seeks to recover
actual damages is entitled to a jury trial."). It might even be
argued that affording preclusive effect to a Board's finding of
confusion in a subsequent infringement dispute would violate the
Seventh Amendment right to a jury trial. See Material Supply
Int'l, Inc. v. Sunmatch Indus. Co., Ltd., 146 F.3d 983, 988 (D.C.
Cir. 1998) (district court violated right to jury trial by
deciding ownership of mark prior to submitting related non-
equitable claims to jury).

Moreover, as the Eleventh Circuit has noted, "while the preclusive effect of an administrative decision will depend in part on the adjudicative quality of the agency action and on traditional principles of collateral estoppel . . ., Congress can also limit the preclusive effect of an agency decision for the sake of some other public policy." Freedom Sav. and Loan Ass'n v. Way, 757 F.2d 1176, 1180 (11th Cir. 1985) (citations omitted). In the case of district court review of Board findings, "the ability of courts to hear appeals on a de novo basis reflects a Congressional intent not to invoke the immunizing doctrines of res judicata or collateral estoppel with regard to [Board] pro-ceedings." Id. Thus, "a court hearing an infringement claim is not legally and conclusively bound by a prior decision of the [Board] regarding the same trademark dispute." Id.; see also Levy v. Kosher Overseers Ass'n of Am., Inc., 104 F.3d 38, 43 (2d Cir. 1997) (decision of Board denying registration of mark on grounds that consumers were likely to confuse it with another registered mark did not have preclusive effect in subsequent trademark infringement action); Jim Beam Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 736 (2d Cir. 1991) ("district court erred in ruling that [defendant] was barred from contending that there was little likelihood of confusion" due to prior adverse Board decision).

20

This rule makes eminent practical sense.  The likelihood of

confusion inquiry during cancellation proceedings is different

from that in an infringement action.  See Levy, 104 F.3d at 41-42

(noting that cancellation analysis only considers applicant's

mark as shown in application, while infringement analysis is much

broader, considering actual usage, consumer perception, and other

factors from the "entire marketplace context"); Jim Beam, 937

F.2d at 734-35 (same); see also J. Thomas McCarthy, 5 McCarthy on

Trademarks and Unfair Competition § 32:101 (4th ed. 1999) ("[A]

determination of a likelihood of confusion in the context of an

opposition or cancellation and its review on appeal . . . . may

sometimes bear little relevance to the issues presented in a

subsequent infringement suit.").  Giving preclusive effect to the

Board's findings would necessarily create pressure upon litigants

defensively to expand the record before the Board to cover the

"entire marketplace context," thereby disrupting the efficiency

and narrowness of focus that Congress intended to confer upon the

Board when it established the Board's specialized role.

For all of these reasons, the Court will not give preclusive

effect in Life's infringement action to the Board's finding that

a likelihood of confusion exists between the parties' marks.

That finding of confusion was made in the context of a cancella-

tion proceeding and this Court has ruled that it was supported by

"substantial evidence" in the record.  Nevertheless, any affirma-
tive infringement case by Life must be tried independently of the
Board's determination.

IV.  Conclusion

For the foregoing reasons, the Court GRANTS Life's motion
for summary judgment as to Carefree's trademark infringement
claim against it and DENIES Life's motion as to its own counter-
claims [Docket # 16].  The case stands for trial on Life's de-
claratory judgment and Sherman Act counterclaims should it wish
to press them.

WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

22